**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| V. | * | Cr. No. GLR-23-026 |
| RYAN DALES | * | |
| Defendant | * | |
| For: RYAN DALES | * | |

## DEFENDANT'S REPLY TO GOVERNMENT OPPOSITION TO MOTION TO SUPPRESS AND TO SEVER COUNTS

RYAN DALES, by his undersigned counsel, submits this reply to the Government's opposition to his motion to suppress and to sever and as grounds states:

The defendant responds to the Government's opposition to his motions to suppress and for severance and states:

- This case is not a child pornography case.

- There are no dates alleging any illegal activity after September, 2021, in the search warrant affidavit nor evidence of "ongoing criminal activity".

- No evidence in the search warrant affidavit shows that any illegal activity occurred at the Fort Avenue address

- No factual or legal connection exists between the charged fraud counts and the drugs/gun charges.

## GENERAL LEGAL BACKGROUND

"The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*,    365 U.S.

505, 511 (1961):and *Kyllo v. United States*, 533 U.S. 27, 31 (2001).    These cases strictly prohibited warrantless searches of a person's home because "Ultimately, … "when it comes to the Fourth Amendment, the home is first among equals," *Florida v. Jardines*, 569 US 1, 6 (2013).   Given the strident protection provided by the Fourth Amendment regarding a person's home, any warrant issues must be proper and scrutinized carefully to comply with the Amendment because the "physical entry of the home is the chief evil against with the wording of the Fourth Amendment is directed…" *United States v. United States District Court*, 407 U.S. 297, 313 (1972).   Any other result " leaves individuals secure from Fourth Amendment violations "only in the discretion of the police."    *Katz v. United States*, 389 U.S. 347, 358-359 (1967), *quoting Beck v. Ohio*, 379 U.S. 89, 97 (1964).

To qualify as Constitutional support for a search warrant of an individual's home, the affidavit must not only provide probable cause, but " it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time."   *Srgo v. United States*, 287 U.S. 210-211 (1932).   Thus, the    "fourth amendment bars search warrants issued on less than probable cause, and there is no question that time is a crucial element of probable cause." *United States v. McCall*, 740 F.2d 1331, 1335 (4th Cir. 1984). A warrant may be "suspect because the information on which it rested was arguably too old to furnish 'present' probable cause." *Id*. The question to be decided is "did the facts alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises searched?" *Id*. (emphasis added).

Timing is crucial in the instant case to any finding of probable cause.   The question,

therefore is not whether law enforcement had probable cause to search the defendant's home in September, 2021, but whether any such facts, sixteen months later with no illegal activity in the interim, were "so closely related in time" to the date of the warrant that probable cause the evidence of a crime would be found in January, 2023 at the Fort Avenue address.[1]

### TIMING FACTS IN AFFIDAVIT

The Gorman affidavit, Exhibit 1 to ECF 58, discusses three offenses that it attributes to Mr. Dales: two that occurred in December, 2020 - a false PPP loan application filed from an IP address identifying the source location as the Volunteers of America, and a false EIDL application, with no IP address listed for the electronic filing.The third alleged offense regards an online filing for another false PPP loan application in March, 2021, again with no electronic location identified.   Per the affidavit, Mr. Dales did not live at the searched Fort Avenue address until January, 2022.   After March, 2021, the only other activities related to the listed offenses were an alleged uploading of two documents in July, 2021, with no IP address identified and payments made as a result of the loan applications in August to September, 2021.   Although other allegations are made against

---

[1]    The Government, ECF 58, p. 7, asserts that the defendant does not argue that the that the Gorman affidavit lacked probable cause ("Defendant does not argue to the contrary.") The Government's statement is incorrect.     The entire point of the motion is that the affidavit lacked probable cause to believe any evidence of a crime would be in the defendant's apartment sixteen months after the last alleged illegal activity.   And, the defendant specifically argued the lack of probable cause in his motion, ECF 49, p. 4: "Because the affidavit is wholly lacking in current probable cause,…"   To the extent that the Government is proffering that the defendant would agree that law enforcement had problable cause to search the defendant's residence in September, 2021, for reasons stated *infra*, Dales does not agree with that conclusion either.   Regardless, it matters not whether probable cause existed in September of 2021 - the only releavant probable cause question involves the search executed in January, 2023.

Mr. Dales in the affidavit, a close review of them shows <u>no</u> dates of <u>any</u> illegal activity claimed against Dales occurring after September, 2021.[2]

The Gorman affidavit, talks about search warrant returns from several accounts the Government claims are associated with Mr. Dales - Google and Apple accounts. Although the affidavit lists the precise date the warrant returns were received, the affidavit does not provide a single date that any of the offending content was created. For example, the affidavit states that false drivers' licenses were found in an iCloud account attributed to Dales, but it nowhere states whether these images were from 2021 or before and certainly nothing indicates they were created or used after September, 2021.[3]    The Google warrant for an email claimed to be used by Dales was returned in November, 2022, but provides only emails in May, 2021, and nothing since.    Finally, the Gorman affidavit states that Dales used the phone number ending in **7684 to talk to his probation officer and his landlord but lists no phone calls after September, 2021, related to any illegal purpose.

It is against this factual backdrop that the Government seeks to justify a search sixteen months after any illegal activity is even alleged to have occurred.

---

[2]    As discussed *infra*, the absence of any illegal activity by Dales after September, 2021, directly contradicts the Government's suggestion of a "ongoing criminal activity" in January, 2023.

[3]    Indeed, the "target offense" listed in the affidavit is wire fraud, not identity theft or bank fraud, which is the offense generally committed when a defendant uses a false identification.    The affidavit does not provide any information that the false IDs were ever actually used by Dales, or anyone; no bank or retail records showing fraudulent purchases and, obviously, nothing that would connect the use of these IDs to the January, 2023, search.

**ARGUMENT**

 I. <u>The motion to suppress should be granted</u>

 A. This case is not a child pornography case.

To avoid the staleness issue in the search of the Fort Avenue address, the Government

cites a series of cases that support a proposition that certain types of records are

maintained indefinitely and, therefore, the 16 month gap between the last alleged illegal

act by Mr. Dales and the search in January, 2023, was therefore proper.   Nearly all of the

cases cited are child pornography cases that, by their own terms, do not apply to

non-child pornography cases.   And, they do not apply here.

 *United States v. Boysk*, 933 F.3d 319 (4th Cir. 2019), *United States v. Richardson*,

607 F.3d 357 (4th Cir. 2010) and *United States v. Raymonda*, 780 F.3d 105 (2nd Cir. 2015)

are all child pornography cases which, by their own terms are starkly different from other

"records search" cases such as the instant one.   *Boysk*, at 330, relies on the holding in

*Richardson*:

> In the context of child pornography cases, courts have largely concluded that a
> delay — even a substantial delay — between distribution and the issuance of a
> search warrant does not render the underlying information stale. This
> consensus rests on the widespread view among the courts — in accord with
> Agent White's affidavit — that "collectors and distributors of child
> pornography value their sexually explicit materials highly, `rarely if ever'
> dispose of such material, and store it `for long periods' in a secure place,
> typically in their homes." *United States v. Lacy*, 119 F.3d 742, 746 (9th
> Cir.1997)

*Richardson* at 370.   In fact, up to three years delay is not problematic in such cases;

*Richardson* cites *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008)

that held that a "three-year delay between acquisition of child pornography and

application for warrant did not render supporting information stale since "customers of child pornography sites do not quickly dispose of their cache".

The unusual distinction regarding, essentially eliminating, staleness in seeking records in child pornography cases rests on the Courts' conclusion as stated in *Raymonda*. In *Raymonda*, the affidavit stated that child pornography images were accessed in January, 2011 from an IP address subscribed to by the defendant; the seach of his home occurred nine months later.   *Id.*, at 110.   The Court considered the staleness issue: " we may conclude that a warrant lacks probable cause where the evidence supporting it is not "sufficiently close in time to the issuance of the warrant" that "probable cause can be said to exist *as of the time of the search*"—that is, where the facts supporting criminal activity have grown stale by the time that the warrant issues."   (emphasis in original).   Child pornography cases, however, are different:

> Because "it is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes," evidence that such persons possessed child pornography in the past supports a reasonable inference that they retain those images—or have obtained new ones—in the present. *Id.* (internal quotation marks omitted); *see also United States v. Vosburgh,* 602 F.3d 512, 528 (3d Cir.2010) ("[P]ersons with an interest in child pornography tend to hoard their materials and retain them for a long time."); *United States v. Gourde,* 440 F.3d 1065, 1072 (9th Cir.2006) ("Collectors act like pack rats . . . [,] rarely, if ever, dispos[ing] of their sexually explicit materials.)

*Raymonda* at 114.   As a result, the Court held that "We have recognized that the determination of staleness   in investigations involving child pornography is "unique." *United States v. Irving,*  452 F.3d 110, 125 (2d Cir.2006)." *Id.*[4]

---

[4]   Interestingly, the Court found the search improper and supressed the evidence: "The "alleged `proclivities' of collectors of child pornography," … are only relevant if there is probable cause to believe that [a given defendant] *is* such a collector" and the Court held

Simply put, by the plain language of the cases cited by the Government, time delays approved in searching for child pornography records do not apply to fraud cases.   The length of time these records are kept is starkly different, and the types of records to be found in a child pornography cases are not the type sought in a fraud case.

B.   Multi-year fraud and narcotics cases are similarly inapplicable

Other cases cited in the Government's opposition similarly do not support its position either.   *United States v. Singh*, 390 F.3d 168 (2nd Cir. 2004), for example, is a case in which the defendant was alleged to have committed a multi-year, continuous health care fraud scheme.   *Id.*, at 179-180.   The Court held that in light of evidence of a long-term multi-year ongoing fraud scheme as late as October, 1997, a search of the defendant's home 20 months after the Government's last witness interview later was proper.

Of significance in *Singh*, and not true in the instant case, the Government had been given information in the affidavit that the scheme was committed in the defendant's home:   [w]ith respect to the billing process, [defendant's former office manager] Storm stated that Singh's wife, Jesleen Singh, came to the Practice office three to four days each week and was involved in every aspect of the business of the Practice. In his final interview, Storm revealed that Jesleen Singh worked on the business payables and payroll of the Practice at the Singh residence."   *Id.*, at 180.   In finding probable cause existed to search the defendant's home, the Court stated that Storm had presented "the part

---

that the affidavit, that showed only one time of access to the improper images did not establish the defendant as a collector who would thereby be consisered to hold the images *ad infinitum*.

played by Ms. Singh in the business of the practice and <u>provided the necessary</u>

<u>information that Ms. Singh maintained billing and accounts payable records at the Singh</u>

<u>home</u>. Her activity at the residence was of a continuous and protracted nature…"

(Emphasis added).    Nothing similar applies here- there is no multi-year protracted fraud

scheme and nothing was alleged to have occurred in Mr. Dales' residence.

Finally, the Government cites narcotics cases to seek to excuse the sixteen month

delay in this case.    But, "narcotics conspiracies are the very paradigm of the enterprises

for which the courts have relaxed the temporal requirements of non-staleness." *United*

*States v. Rowell*, 903 F.2d 899, 903 (2nd Cir. 1990), quoting <u>United States v. Feola,  651</u>

<u>F.Supp. 1068, 1090 (S.D.N.Y.1987)</u>, *aff'd mem.,* 875 F.2d 857 (2d Cir.), *cert. denied,* ___

U.S. ___, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989). As a result, the court held that given "the

continuous nature of narcotics conspiracies and Rowell's statements to the Florida

undercover officer about his on-going marijuana distribution operation, the approximately

18-month delay between procuring the informants' statements and seeking the wiretap

warrant did not render the information stale."    *Rowell*, *id*.

*United States v. Farmer*, 370 F.3d 435 (4th Cir. 2004), also cited by the Government

for the proposition that financial records are the type to be kept for a long time also

involved a muti-year, half million dollar counterfeit clothing scheme.    Although the last

sale listed in the affidavit in support of the search warrant for Farmer's home was in June,

1997 and the search was thirteen months later in July 1998, the Court found that the time

delay did not diminish probable cause.    " Farmer was under investigation for trafficking

in counterfeit clothing and money laundering — not mere isolated violation[s] of the law,

but criminal activities of "a protracted and continuous nature."    *Id*., at 439 (internal

quotations omitted).    Further, because the counterfeit scheme dated back to 1996 and thus was ongoing and continuous for at least a year, the Court reasoned that "Farmer's large-scale counterfeiting operation [was] unlikely to have been suddenly abandoned…" *Id*.    To hold otherwise would be "to suppose that a successful and profitable criminal enterprise simply faded away for no apparent reason."    *Id.*

Nothing similar is established in Mr. Dales' case.    No million dollar scheme - indeed, two loans did not go through and the most that was paid to Dales was $25,570. And, no loans were submitted using Dales' information after March, 2021.    The affidavit fails to justify the 16 months between September, 2021 and the search in January, 202<u>3</u>.

C.   Rather than showing an ongoing, continuous fraud scheme, the Gorman affidavit shows the opposite

The Gorman affidavit, rather than establishing any sort of ongoing crime, in fact proves just the opposite.    No illegal acts are alleged after September, 2021 (and that date is generous given that it simply involved payments to Dales and no action on his part at that point), and instead the affidavit reveals three similar crimes, all of which ended by the Fall of 2021.    But, it is not just lack of any evidence after September, 2021, but the absence of such evidence in light of the the information obtained by Agent Gorman is particularly telling.

Law enforcement received records from Dales' phone number, email and iCloud accounts as recently as November and December, 2022.    It is beyond cavil that if Gorman had *any* image, email or illegal phone contact after September, 2021 he would have undoubtedly put that information in the affidavit.    That he did not speaks volumes- it tells the Court, and should have told the Magistrate Judge, that the Government had no

evidence of any illegal activity by Mr. Dales after September, 2021.

The affidavit even suggests that Dales had not only ceased any illegal activity, but had run out of money.   At paragraph 72, the affidavit states that as of December 7, 2022, Dales was four months behind in his rent, with only one payment in November of 2022. Assuming December was one of the delinquent months and the November payment covered November's rent, the affidavit provides that Dales failed to pay for October, September and August, meaning that his last rent payment was in July, 2022.   Such delinquency does not support, or even suggest, any ongoing fraud activity by this defendant.

Consistent with this absence of evidence, although the affidavit provides that fake IDs were found in Dales' iCloud account, the affidavit provides no evidence that those IDs were ever used - no bank records, no retail transactions, no credit card records showing attempted use of a false identification.   Again, had any such evidence existed to show any criminal behaviour by this defendant after September, 2021, it would have been critical to put in the affidavit.[5]

D.  All of the illegal activity alleged occurred at the VOA and no nexus exists connecting the Fort Avenue address to illegal activities

In addition to establishing timely probable cause, an affidavit to support a search warrant must provide a nexus from the crime to the search location.   The affidavit must show that " there is a fair probability that contraband or evidence of a crime will be found

---

[5]   The affidavit points out that in 2017, Dales was convicted of bank fraud and aggravated identity theft.   That case,   GLR-17-060, also involved the use of false ids, see GLR-17-060, ECF 37, at pp. 9-10 (statement of facts with plea agreement).   The images found on the iCloud, therefore could equally reasonably have been remnants of the prior fraud case.

in a particular place. "    *Illinois v. Gates*, 462 U.S. 213, 238 (1983).    Thus, "[I]n determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched. *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 & n. 6, 98 S.Ct. 1970, 1976-77 & n. 6, 56 L.Ed.2d 525 (1978)."    *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993).    "In this and other circuits, residential searches have been upheld only where some information links the criminal activity to the defendant's residence."    *Lalor*, at 1583.    No such evidence was provided here.

The three electronic fraudulent transaction alleged in the affidavit all occurred when Dales lived at the Volunteers of America (VOA) halfway house and well before he moved into the Fort Avenue address.    According to the Gorman affidavit, para. 28, Mr. Dales lived at VOA from December 9, 2020, to June 4, 2021.    Each of the alleged fraudulent loans were applied for electronically by computer during that time.    Nothing in the affidavit provides that the loans were applied for on Mr. Dales' phone - in fact the affidavit proves otherwise because documents were uploaded with the applications, most likely by computer.    To the extent that records are kept for extensive periods on computers, any records, therefore, would not be at Fort Avenue, but at the VOA.[6]

E.    Possession of a cell phone does not provide probable cause to search a person's home

Finally, although it is not quite clear, the Government seems to argue that it is

---

[6]    In *Farmer*, in addition to finding that a million dollar counterfiet clothing scam did not suddenly disappear, the Court also found that the defendant, back when people used landlines, made calls on his home phone to conduct his counterfeit business, which created s definitive nexus from the crime to the defendant's home.    *Farmer*, at 437-438.

possible that because the phone number ending in **7684 is associated with Mr. Dales, the affidavit provided probable cause to search Dales' residence to obtain the phone.    In addition to the legal and Constitutional concerns raised by such a position, the facts here do not even support it.

But the simple idea that possession of a cell phone that *might* have information on it, would permit, at virtually any time and without proof that the same cell phone was still possessed, a search of a person's home is a frightening challenge to the protections of the Fourth Amendment.    The Government does not cite any authority for this proposition and the defense has found none that support it.    This argument must be rejected.

F.    The *Leon* good faith exception does not apply here.

The Gorman affidavit fails on a number of levels to establish probable cause that in January, 2023, evidence of a crime was likely to be found at the Fort Avenue address. Nothing illegal was alleged to have occurred for over 16 months, the address searched is not the one from which the illegal activity originated, there was no nexus between the crimes alleged and any address other than VOA.    In situations where an affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable", the exception to the exclusionary rule does not apply.    *United States v. Leon*, 468 U.S. 897, 924 (1984).    This exception to *Leon* is particularly appropriate, and applied where the affidavit fails to meet the required nexus connecting the location to criminal activity.    See, *e.g.*, *United States v. Flores-Reyes*, Case No. PX-17-382, ECF 487 and *United States v. Kosta*, Case No. 12-10226-DJC, ECF 452, both attached hereto as Exhibits 1 and 2, respectively.

Due to the inadequacies of the Gorman affidavit and in light of the lack of

probable cause for a search of the defendant's home in January, 2023, the motion to suppress should be granted in order the protect the Fourth Amendment's right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.

II    The motion for severance should be granted

  A.  Introduction

The instant indictment charges a series of offenses.    Specifically, count 1 charges a wire fraud scheme beginning in December, 2020, and ending in September 2021, involving alleged fraudulent obtaining of COVID-19 unemployment insurance benefits ("UI fraud") ECF 35. Counts 2 through 4 concern a search of the defendant's residence on January 20, 2023, nearly one and one-half years later in which drugs and guns were claimed to be found; these guns and drugs are unrelated to the wire fraud allegation. Finally, counts 5 through 7 alleged an entirely different fraud scheme involving identity theft that occurred from August, 2022, and concluded in September, 2022 ("ID fraud").

The defendant has moved, in ECF 50, to sever the PPP fraud count from the other counts and the drug/gun charges from the fraud counts.    The Government argues that the fraud counts should be tried together because they are similar in nature and both are charged under 18 U.S.C. sec. 1343.    The defendant agrees that the the same statute is charged, but contends that the fraud crimes are of such different nature that they ought not be tried together.    The Government's argument regarding the drug/gun charges, however, appears to be created out of whole cloth    - unsupported by any evidence, the Government imagines that money from the fraud counts was used to purchase the drugs and guns.    And the Government believes that because fraud schemes are committed to make money, and that drug sales are committed to make money, ECF 59, p. 21, that the

two offenses are therefore of similar character.    The defendant will briefly address the fraud count severance and strongly opposes trying the drug/gun counts with any fraud count.

B.    The fraud counts are sufficiently dissimilar to be tried together.

Although each of the fraud counts involved some level of deceit, the types of crimes alleged in the loan fraud counts are materially different in time and in kind from the identity theft offenses.    A loan fraud offense involves false statements about oneself-one's history, business, employment, etc.    Identity theft is far more serious because it affects another person's life and economic well-being as well as defrauding retail businesses, causing losses in the economy.    The concern is that the jury may well consider that if Mr. Dales were willing to commit the more serious crime of identity theft, he likely, without knowing more, would be willing to commit the loan frauds.    Because each charged count must be considered on its own merits, such a potential for a prejudicial spillover must be avoided.

Further, the Government suggests that the loan frauds, allegedly committed from December 2020, to March 2021, and the ID theft charges that occurred over fourteen months later are part of one scheme.    Nothing in the indictment provides any connection or relationship between these two crimes - other that Mr. Dales being the defendant in both.    Separate trials on the fraud counts avoids any potential for prejudice against this defendant.

C.    The drug/gun counts are so vastly dissimilar to the fraud counts that they cannot be tried together

Federal Rule Criminal Procedure 8(a) permits joinder of counts that "are of the same

or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."    None of these criteria apply to the fraud and drug/gun counts.

It seems obvious that the fraud counts and drug/gun counts are not "of the same or similar character" and are not based on the "same act or transaction."    These counts can only be tried together if the Court finds that they "constitute parts of a common scheme or plan."    In seeking to try the drug/gun counts with the fraud counts, the Government acknowledges that these offenses are not from the same statute.    Instead, they are discrete and dissimilar, both in time and description.    The fraud counts ended in September, 2022; the drugs and guns were not discovered until January, 2023.    Rather, the Government wants the Court to hold, with no evidence to support it, that the drugs and gun counts were part of a the "fraud scheme."

The parties agree that "joinder is the "rule rather than the exception," *United States v. Armstrong,* 621 F.2d 951, 954 (9th Cir. 1980), "because of the efficiency in trying the defendant on related counts in the same trial." *United States v. Cardwell,* 433 F.3d 378, 385 (4th Cir. 2005). The requirements of Rule 8(a), however, "are not infinitely elastic,… and so cannot be stretched to cover offenses . . . which are discrete and dissimilar."    *United States v. Hawkins*, 776 F.3d 200, 206 (4th Cir. 2009) (internal quotations omitted). Joinder of unrelated charges "create[s] the possibility that a defendant will be convicted based on considerations other than the facts of the charged offense." *Hawkins, id*, quoting *Cardwell,* 433 F.3d at 385 and *Bruton v. United States,* 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("An important

element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence.")

In *Hawkins*, the defendant was charged, in one trial, with an armed carjacking that occurred on November 22, 2006 and possession of a (different) firearm by a convicted felon that occurred on December 9, 2006, seventeen days later. The Fourth Circuit held that trying these offenses together violated Rule 8(a) and vacated the defendant's convictions. The Court rejected the Government's argument that the charges were sufficiently related because they were only 3 weeks apart. *Id*., at 207. In addition, despite each court relating to a gun possession, the Court held the counts should not have been tried together. "However, in the case at bar, the Government has proffered no evidence demonstrating a logical and close connection between the alleged carjacking and possession of a .357 caliber revolver on November 22, and Hawkins' possession of a .9 millimeter pistol on December 9." *Id*., at 207-208. Instead, as in the instant case, the only connection between the charges was the named defendant, which is insufficient for a joint trial: "[i]n this case, the only connection we discern between Count III and the carjacking counts is the appellant, Hawkins. We have held previously such a connection is not sufficient to sustain joinder." *Id*., at 209.

Fraud and drug/gun charges are far less connected or similar than an armed kidnapping and a subsequent felon-in-possession charge a mere 17 days later. And the fraud and drug/gun charges are not 3 weeks apart, they are at least 4 months apart. No caselaw authority permits trying fraud counts in 2021 and 2021 and 2022 with drug and gun possession in 2023.

D.    A defendant's interest in making money does not make all of his activities part of one overall scheme

Seeking to connect these otherwise unrelated offenses the Government imagines that "all of the offenses relate to Defendant's goal to obtain money and property however he can—through his sale of drugs (and possession of firearms) and through his various Wire Fraud and Identity Theft schemes. Further, it is plain that the funds Defendant acquired in connection with his Wire Fraud and Identity Theft schemes to finance the rental of his apartment (which he used to package the drugs for distribution) and that he used those funds to acquire the drugs and his firearm with the hope of reselling them at a profit."   ECF 58 at p. 21.   Neither of these suppositions is supported by any evidence and both are unconvincing.

If joinder is permitted for any counts in which a defendant seeks to "obtain money" then nearly every charge in the United States criminal code can be charged together.   Fraud is to make money, espionage is to make money, bank robbery is to make money, drug sales are to make money, even illegal immigration is to come to America to make money.   All gang activities, including murder and assaults to advance the gang's purpose, are to make money.   The incentive to make money does not make otherwise unrelated offenses part of a "common scheme or plan" under the Rule; if it did, all nearly all crimes could be tried together and the first two criteria of Rule 8(a) would be rendered moot.

E.    The record is devoid of any evidence that the defendant used fraud money to fund drug or gun possession

Nothing in the record or evidence in this case supports the next proposal from the Government - that the fraud and drug/gun counts are related because the defendant used

the fraud funds (of which the affidavit shows he ran out in July, 2022), "to acquire the drugs and his firearm with the hope of reselling them at a profit." First, the idea that in order to sell drugs a person must first have a nest egg of investment is both unsupported and untrue. The vast majority of persons who enter the drug trade do so precisely because they have no money and perceive (perhaps wrongly) no other method for earning money. Second, persons can enter drug conspiracies that are already funded - drug conspiracies do not require a "buy in". And, given the number of cases in which counsel is appointed for drug defendants who have no money, plainly cash on hand in advance is not a requisite for drug sales.

More importantly, the Government presents no evidence - no bank records, ATM records, cash deposits or transactions - that show any use of the $25,000 paid in September, 2021, much less that the money was used to buy drugs and guns. The fact, if proven, that drugs and guns were found in the Fort Avenue address might lead to a conviction for possession, but it does not establish even that this defendant owned the drugs or guns or ever spent money to obtain them. This last contention by the Government should be rejected and both unsupported by any evidence and contrary to common sense.

The evidence on the fraud counts is circumstantial - many persons used computers at the VOA and had access to Dales' information. But the drug/gun counts are far more direct - items located in his residence. The Government seeks to use the stronger evidence on the drug.gun counts to convict on not only those counts, but to have a jury convict on all courts; if the jury perceives the defendant as a drug and gun dealer, what is the harm of convicting him on the lesser fraud counts? Such a result is impermissible

and the drug/gun counts should be severed.

## CONCLUSION

WHEREFORE, RYAN DALES moves this Honorable Court to grant his motion to suppress and motion to sever counts.

Respectfully submitted,

_____/s/_____
Richard Bardos
Schulman, Hershfield & Gilden, P.A.
1 East Pratt Street, 9th Floor
Baltimore, Maryland 21202
(410) 332 0850

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 12th of April, 2024, a copy of the foregoing was served electronically by ECF to: Office of the United States Attorney, 36 South Charles Street, Fourth Floor, Baltimore, Maryland 21201 and all defense counsel.

_____/s/_____
Richard Bardos