## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **RYAN E. DALES,** | * | **CRIMINAL NO. GLR-23-026** |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER**

The United States of America respectfully submits this Response in Opposition to Defendant's Motion for Reconsideration of Denial of Motion to Suppress (ECF No. 76) ("Motion") filed by Defendant Ryan Dales in this matter.  For the following reasons, the Court should summarily deny the Motion without a hearing.

### FACTUAL BACKGROUND

This matter arises out of Defendant's receipt of fraudulently-obtained funds and property in connection with various fraud schemes, along with Defendant's possession of two firearms (including an unserialized "ghost gun") and fentanyl, which were seized during a January 20, 2023 search of Defendant's residence located at 900 E. Fort Avenue, Apt. 537—the "Anthem House," a luxury apartment building in the Locust Point area of Baltimore City.

**A. Defendant's Fraudulent UI Claim.**

Defendant's UI scheme began while he has living in a Volunteers of America (VOA) half-way house serving a federal sentence in connection with a November 2017 federal conviction in the District of Maryland for Bank Fraud Conspiracy in violation of 18 U.S.C. § 1349 (Count One) and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1) (Count Five). *See United*

1

*States v. Ryan Dales*, GLR-17-60;[1] *see also* Ex. 1, Gorman Affidavit, at 8.[2]  On May 3, 2019, Defendant was sentenced to 38 months' imprisonment as to Count One and 24 months' imprisonment, consecutive, as to Count Five.  Gorman Affidavit, at 8.  Defendant lived at VOA from December 9, 2020, to his release date of June 4, 2021. *Id.*  Upon completion of his sentence, Dales began the period of his supervised release. *Id.*

Shortly after he began residing that VOA halfway house, on December 15, 2020, Dales submitted electronically to the Maryland Department of Labor (DOL) an application seeking UI benefits falsely claiming that (1) Defendant's occupation was as a barber, (2) he stopped being able to provide services in April 2020, and (3) listed an email address of theycallmedales@gmail.com. *Id.* at  8–9.  The DOL ultimately rejected the claim. *Id.* at 9.

Six months later, on July 30, 2021, Defendant reopened his claim for UI benefits seeking benefits under the PUA program[3] and in support of the application uploaded electronically a false and fraudulent Internal Revenue Service (IRS) form for a purported business known as the "KNW Group." *Id.* at 10-12.  As a result of the fraudulent application, the Maryland DOL between August and September 2021, paid Defendant $25,570 in UI funds. *Id.* at 12.

---

[1] This matter involved Defendant's use of the personal identity information (PII) of various victims to obtain counterfeit identification cards such "as driver's licenses or state-issued identifications, using the victim's PII but the picture of the Defendant or a co-conspirator."  Crim. No. GLR-17-0060, ECF No. 37 (Plea Agreement) at 9.  Thereafter, "Defendant and/or his co-conspirator then traveled to a retail store which offered customers 'instant credit' if approved for a store-branded credit card. These credit cards were, in fact, issued by financial institutions, which extended credit for purchases made using these cards." *Id.*  Defendant and his co-conspirators received actual extensions of credit of approximately $241,852 in connection with their scheme. *Id.*

[2]  The Gorman Affidavit was previously filed at ECF No. 58-1.

[3] States are permitted to provide PUA to individuals who are self-employed, seeking part-time employment, or otherwise would not qualify for regular UI compensation. An individual must not be eligible for regular UI benefits and be unemployed, partially unemployed, or unable or unavailable to work because of certain health or economic consequences of the COVID-19 pandemic. *Id.* at 10 n.2.

**B. Defendant Submits Fraudulent EIDL and PPP Loan Applications.**

As stated in the Gorman Affidavit, on December 29, 2020, Dales also submitted electronically an Economic Injury Disaster Relief (EIDL) application for "Dales Drop Inc." (Dales Drop)—a purported agricultural business—belonging to Dales. *Id.*  The application contained a phone number used by Defendant and the email address theycallmedales@gmail.com. *Id.*  The application also falsely indicated "No" to the question of whether Defendant had within the past five years, among other things, been placed on any form of probation or parole. *Id.* at 13.  The fraudulent EIDL application was ultimately denied. *Id.*

Dales also electronically submitted an application for a Paycheck Protection Program (PPP) loan to Cross River Bank on or around March 24, 2021, for a purported sole proprietorship owned by Defendant.  The application asserted over $8,000 in average monthly payroll for the sole proprietorship, and sought more than $20,000 in funds for "payroll, rent/mortgage interest, utilities, and covered operations, expenditures, and covered supplier costs."  The application listed a business start date of "08/2018"—a time when Defendant would have been incarcerated. *Id.* at 14.  Moreover, the application included a purported IRS tax form which stated that Defendant's "principal business" was "home improvement" and that falsely answered "Yes," to the question whether Defendant did "materially participate in the operation of this business during 2019." *Id.* Defendant was incarcerated during the entirety of 2019. *Id.*  The PPP application likewise listed email address theycallmedales@gmail.com.[4] *Id.*  The loan ultimately did not close.

**C. Execution of Search Warrants On January 20, 2023, Arrest Of Defendant, And Defendant's Confession.**

On January 20, 2023, law enforcement executed a federal search warrant at Defendant's

---

[4] Law enforcement obtained a federal search and seizure warrant for this account, among others. *Id.* at 15-17.

residence located at 900 E. Fort Avenue, Apt. 537, Baltimore, Maryland 21230. That warrant was previously authorized by the Honorable J. Mark Coulson on January 18, 2023; it authorized the seizure of evidence, fruits, and instrumentalities of violations of Wire Fraud (18 U.S.C. § 1343). *See, e.g.* Ex. 1, Gorman Affidavit at 4, 15.

That same day, law enforcement arrested Defendant pursuant to an arrest warrant.[5]  During the execution of the search warrant for Defendant's residence on the morning of January 20, 2023, law enforcement observed in plain view two firearms and suspected drugs in plain view.  They then that same day sought and obtained a warrant to seize these items, as well as other evidence relating to Felon in Possession of a Firearm (18 U.S.C. § 922(g)); Possession With Intent to Distribute a Controlled Substance (21 U.S.C. § 841(a)(1)).  Ex. 2, Baugh Affidavit.

During the searches pursuant to the warrants, law enforcement ultimately located and seized numerous items relating to Defendant's fraud schemes and his illegal possession of firearms and drugs, including: (1) two loaded firearms, one which was stolen and one which was a privately-made "ghost gun" Polymer80 firearm with no serial number;[6] (2) numerous packages of suspected controlled dangerous substances—including suspected fentanyl;[7] (3)  multiple digital scales, sifters, empty capsules, drug packing materials, and suspected cutting agents; (4) six mobile devices; (5) multiple computers; (6) an embosser and ID card printer; (7) laminate sheets with security holograms; (8) gift cards in various denominations; (9) bulk packages of shrink-wrapped

---

[5] On January 13, 2023, Defendant was charged by Criminal Complaint in the U.S. District Court for the District of Maryland, and an arrest warrant was issued.  *See* BAH-23-MJ-190, ECF No. 1.

[6] Defendant's DNA was later determined to be present on both firearms.

[7] These items were later confirmed by lab results to be drugs—*i.e.*, fentanyl and a very small amount of cocaine base.

white PVC cards; and (10) three purported South Carolina identification cards containing PII of individual victims but Defendant's photograph.[8]

That same day, Defendant was transported to the FBI Baltimore Field Office and, after voluntarily waiving his *Miranda* rights, agreed to speak to agents. He acknowledged, among other things, that he was currently on federal supervised release and was not permitted to be in possession of firearms. He further stated regarding the firearms that "they are with me." He also told law enforcement that at least some of the suspected CDS in his apartment was probably fentanyl. And Defendant told investigators, among other things, that he purchased the personally identifiable information (PII) of at least 10 individuals on the dark web.

**PROCEDURAL HISTORY**

On January 25, 2023, Defendant was indicted by a federal grand jury in the District of Maryland with Wire Fraud, in violation of 18 U.S.C. § 1343 and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 15). The Wire Fraud charges pertained to Defendant's receipt of fraudulent UI benefits. (*Id.* at 1–4).

On May 17, 2023, the grand jury returned a Superseding Indictment, charging Defendant with additional counts of Wire Fraud (Counts Five to Seven), a related Aggravated Identity Theft count (Count Eight), as well as Possession With Intent to Distribute Fentanyl, in violation of 18 U.S.C. § 841(a)(1) (Count Three) and Possession of a Firearm in Furtherance of a Drug Trafficking Activity, 18 U.S.C. § 924(c)(1)(A)(i) (Count Four). (ECF No. 35). The new Wire Fraud charges relate to Defendant's scheme to obtain high-end lawn mowers on credit using victim PII and counterfeit IDs for the purpose of reselling the lawnmowers for cash. (*Id.* at 8–12). The drug and

---

[8] These counterfeit identification cards were all used in connection with the Wire Fraud and Aggravated Identity Theft scheme charged in Counts Five to Eight of the Superseding Indictment.

related firearm charges arose out of the results of the search of Defendant's residence on January 23, 2023.

On October 10, 2023, Defendant filed a Motion to Suppress (ECF. No. 49) and Motion to Sever (ECF No. 50).  On March 29, 2024, the Government filed its Response in Opposition to the Motions to Suppress and to Sever.  (ECF No. 58).  On April 12, 2024, Defendant filed his Reply. (ECF No. 60).  On May 3, 2024, the Court held a Motions Hearing, denied the Motion to Suppress, and granted in part and denied in part the Motion to Sever.  (ECF Nos. 61, 62).

On October 16, 2024, Defendant filed a Motion for Reconsideration of the Denial of Defendant's Motion to Suppress. (ECF No. 76).  On October 21, 2024, after being alerted to an erroneous statement in his filing, Defendant filed a Supplement to his Motion, correcting the misstatement.  (ECF No. 77).

On October 28, 2024, Defendant filed a Motion to Withdraw Argument II in Defendant's Motion for Reconsideration of Denial of Motion to Suppress.  (ECF No. 83).

The first trial in this matter is set to begin on December 2, 2024.

## ARGUMENT

Defendant argues once again that the initial search warrant authorizing law enforcement to seize evidence from Defendant's residence at 900 E. Fort Avenue lacks probable cause.  *See* Motion at 4–6; Ex. 1, Gorman Affidavit.  More specifically, he contends that the Court incorrectly stated during the May 3, 2024 Motions Hearing that the January 2023 search warrant, *see* Ex. 1, referenced two fraud investigations—COVID fraud and identity theft—where the affidavit only included COVID fraud.  (Motion at 4–6).  This purported misstatement, Defendant contends, justifies reconsideration of his suppression motion.  Defendant then raises the same staleness

6

arguments made in his initial motion and which the Court already rejected. (*Id.* at 4 n.4). For the reasons that follow, the Motion for Reconsideration must be denied.[9]

The Federal Rules of Criminal Procedure do not contain guidance on motions for reconsideration. *United States v. Russell*, --- F.Supp.3d ----, No. 1:97-CR-382-1, 2024 WL 1574923, at *2 (E.D. Va. Apr. 11, 2024). Courts thus look to the Federal Rules of Civil Procedure "as a substantive guidepost" regarding such motions. *See United States v. Benjamin*, No. CR 3:21-525-MGL-1, 2023 WL 3325268, at *2 (D.S.C. May 9, 2023); *see also Russell*, 2024 WL 1574923, at *2 ("[C]ourts in this circuit 'are guided by analogy to the standards established by the civil rules.'" (quoting *United States v. Young*, 260 F.Supp.3d 530, 555 (E.D. Va. 2017))).

"A motion for reconsideration can succeed when it seeks a change in the district court's ruling '(1) to accommodate an intervening change in controlling law; (2) to account for new evidence; or (3) to correct a clear error of law or prevent manifest injustice.'" *Id.* (quoting *Wojcicki v. SCANA/SCE&G*, 947 F.3d 240, 246 (4th Cir. 2020)); *see United States v. Riley*, No. MJG-13-608, 2018 WL 2735056, at *1 (D. Md. June 7, 2018) (applying the same standard).

"When a party in a criminal case moves for reconsideration, it is within the sole discretion of the district court to determine whether it is appropriate to grant the motion." *Russell*, 2024 WL 1574923, at *2 (quoting *United States v. Mallory*, 337 F. Supp. 3d 621, 626 (E.D. Va. 2018)). Motions for Reconsideration are "an extraordinary remedy which should be used sparingly." *Cincinnati Ins. Co. v. Fish*, No. RDB-19-3355, 2022 WL 1225419, at *1 (D. Md. Apr. 26, 2022) (quoting *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)).

---

[9] Defendant has withdrawn his *Aguilar-Spinelli* based argument set out in Part II of the Motion. (*See* ECF No. 83). The argument should thus be disregarded as moot.

Defendant does not articulate a specific basis for his Motion.  Indeed, no such basis exists. There has been no change in controlling law; nor any new evidence.  Nor has there been any error, let alone a clear one.  With respect to motions for reconsideration on the basis of clear error,

> "[M]ere disagreement" with a court's ruling is not enough to justify granting a motion for reconsideration. *Lynn v. Monarch Recovery Mgmt.*, 953 F.Supp.2d 612, 620 (D.Md. 2013) (quoting *Sanders v. Prince George's Pub. Sch. Sys.*, No. RWT-08-501, 2011 WL 4443441, at \*1 (D.Md. Sept. 21, 2011)). Rather, to justify granting a motion for reconsideration on the basis of clear error, "the prior judgment cannot be 'just maybe or probably wrong; it must . . . strike the court as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Fontell v. Hassett*, 891 F.Supp.2d 739, 741 (D.Md. 2012) (alteration in original) (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)). In other words, the Court's previous judgment must be "dead wrong." *Franchot*, 572 F.3d at 194 (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)). Further, a "'factually supported and legally justified' decision does not constitute clear error." *Lawley v. Northam*, No. ELH-10-1074, 2013 WL 4525288, at \*1 (D.Md. Aug. 23, 2013) (quoting *Hutchinson v. Staton*, 994 F.2d 1076, 1081–82 (4th Cir. 1993)).

*Chae Bros, LLC v. Mayor of Balt.*, No. GLR-17-1657, 2019 WL 1040434, at \*2 (D.Md. Mar. 5, 2019).  Defendant comes nowhere close to meeting his heavy burden here.

Defendant argues that the Court made an error when it referenced "two investigations of fraud" in its discussion of this matter at the beginning of the May 3, 2024 motions hearing and then again at the end of the hearing.  (*See* Motion at 3; Tr. Mots. Hr'g at 4, ECF No. 66).[10] Defendant essentially claims that reconsideration is warranted because the Court "import[ed] the subsequently charged counts into the January, 2023, affidavit."  (Motion at 5).  Not so.

*First*, while it is true that the Court referenced a "second fraud," at the beginning of the hearing, there is nothing to suggest that the Court was definitively describing the content of the Gorman Affidavit when it used that phrase.  At the time it did so, the Court was setting the stage

---

[10] The transcript of the hearing is attached as Exhibit 3.

for the case, pending motions, and charges generally—charges that included two species of fraud: a wire fraud scheme involving fraudulently-obtained unemployment insurance benefit and a wire fraud scheme involving the use of victim identities to obtain high-end lawnmowers.

*Second*, even if the Court was referring to the content of the Gorman Affidavit when it made that statement, the affidavit provided a more than sufficient basis for the Court to conclude that there was indeed a "second fraud" involving identity theft and that Defendant's criminal activity was ongoing. Indeed, when defense counsel sought to clarify the Court's earlier statement, the Court pointed to suspected fraudulent identification cards bearing the PII of others, which were discussed in the Affidavit and located on Defendant's iCloud account:

> MR. BARDOS: -- . . . . And I don't think there's an inference that fraud crimes, particularly PPP fraud crimes, go on indefinitely. This is not a wire fraud case of multiple years. This is three separate events, December, March and May of 2021, and that's it. There's no ongoing scheme.
>
> In fact, the three things are very different in what they did. Your Honor, I think you said that you thought that there was identity theft as one of the offenses. I don't --
>
> THE COURT: Right.
>
> MR. BARDOS: -- that's not my reading of it.
>
> THE COURT: I was thinking -- I remember when I read in the affidavit there were discovered identification cards with other people's personal identifying information on them that were in the iCloud account but the Defendant's picture. So that's where I think I picked up the evidence of identity theft.
>
> MR. BARDOS: Yes, I agree with that.
>
> THE COURT: Right.

(Tr. Mots. Hr'g at 12). After all, the Gorman Affidavit not only included indicia of unemployment insurance fraud and Paycheck Protection Program fraud, but also identity theft. Indeed, a review of the Apple iCloud warrant return for the account ryanedales@gmail.com—one of the cloud-based back-up accounts linked to Defendant's telephone—revealed the existence of fictitious Maryland and South Carolina driver's licenses, as well as dozens of "driver's license or mug-shot

style photographs of individuals who were not DALES. Several of these photographs were also found on separate images of Driver's Licenses or State Identification (ID) cards. Some of the ID cards contained the same photo, but different Personally Identifiable Information (PII) listed on the ID." (*Id.* ¶ 66). The Gorman Affidavit continues:

> For example, the search warrant results included a single image of an unknown black male wearing a gray zip-up hoodie in front of a solid off-white background. Your Affiant has located the same image in at least four other identification documents: three Maryland Driver's Licenses and one South Carolina Driver's License, all containing different PII. Queries with the Maryland Motor Vehicle Administration (MVA) indicated the PII on one of the Maryland licenses belonged to a white male who was 6'1" and 200lbs, not the black male pictured and listed as 5'8" and 163lbs. The second Maryland License did not return any results when the Driver's License number was queried with the MVA, indicating it may be fictitious. The third Maryland Driver's license with the same photo listed DALES's name and date of birth, although it is not believed that the photo is of DALES.

*Id.* Law enforcement likewise located in the iCloud backup account at least one apparent fictitious earnings statement in the name of Defendant. (*Id.* ¶ 65).

What's more, the UI, EIDL, and PPP applications submitted by Defendant contained "false statements and misrepresentations regarding DALES, his employment, and purported businesses. At times, the applications included fabricated documents, including fake and fraudulent Internal Revenue Service (IRS) tax records." (*Id.* ¶ 29). Moreover, the Gorman Affidavit noted Defendant's past federal convictions for Bank Fraud and Aggravated Identity Theft, the 62 month sentence imposed by this Court in May 3, 2019, and the fact that the submission of the fraudulent UI application submission was submitted when Defendant was still under the supervision of the Bureau of Prisons. (*Id.* ¶¶ 25–29). And, at the time of the search, Defendant was residing at a luxury two-bedroom apartment with a monthly rent of over $3,000. (*Id.* ¶ 72). Based on all this, there was more than ample probable cause to believe that upon being released from incarceration after his past federal Bank Fraud and Aggravated Identity Theft convictions that Defendant

10

immediately resumed his criminal activity and that it was ongoing.  Thus, the Court's reference to a "second fraud" was perfectly appropriate given the ongoing nature of the Defendant's criminal activity.

*Third*, as for Defendant's argument that the Court referred to the "second fraud" as part of the support for probable cause at the end of the hearing, this argument misses the point.  (Motion at 3).  The Government argued repeatedly that the Affidavit established probable cause to believe that Defendant's crimes were ongoing, and the Court ruled as much.  The Court's reference to the "two alleged fraudulent acts" was in the context of this finding and specifically referenced fraudulent documents in Defendant's iCloud—indicia of identity theft—in addition to all the other indicia that Defendant was engaged in ongoing criminal activity:

> There's sufficient evidence within the affidavit itself that the cell phone was used by this Defendant at the location, although there is some time that did pass between the two alleged fraudulent acts. It's noteworthy that the Defendant was indeed on supervised release for a fraud-related crime and committed this act while -- at least one of these acts while he was on supervised release.[11]
>
> Certainly temporal proximity, and temporal proximity, alone, is not sufficient for the purposes of establishing probable cause. But, nevertheless, the Defendant's use of the cell phone as part of the fraudulent scheme does support the finding of probable cause.
>
> Certainly the Court affords great deference given to the probable cause determination of the judge, and law enforcement may draw inferences based upon their experiences.
>
> As indicated in this case, the Defendant allegedly used electronic device to commit and in connection with a criminal activity. Those devices or that device, including financial records, would be sought. The affiant indicated that financial records are typically kept in residences. There was specific details of the fraud scheme and the Defendant's involvement in the use of his own identifying information. As indicated, the residence was linked through the phone. And as a result, there was a link between the phone and the Defendant's residence.
>
> *There was an assertion within the affidavit that the crime, if not direct and express, was ongoing. The Defendant was on supervised release for a fraud. He committed one fraud while in VOA and then within a relatively -- what this Court considers a relatively short period of time, connected in another fraud. Evidence*

---

[11] As noted, the Affidavit highlighted Defendant's allegedly fraudulent submissions while living in the VOA halfway house.  (Gorman Affidavit at 8).

*on his iCloud account manifested of purported fraudulent documents.* And although the precise dates of those documents, which were not known, the time where they arrived on the iCloud account through the phone service of December of 2020 was known.

So it's not that far or that long a period of time between the *existence of those incriminating items on the iCloud* and the time of active service in the ongoing fraud which fails to support an ongoing scheme.

As indicated, the length of time is not the only factor in determining proper cause. You will need to look to all of the facts and circumstances. Certainly electronic devices, unlike maybe some other evidence such as narcotics, is not likely to be stale given the nature of the electronic storage. And it's not – there's no evidence that this degrades quickly. *This also includes the iCloud account.*

The warrant also sought records and other data on applications and IRS records. So it was just -- it was broader than just simply searching of an electronic device.

(Tr. Mots. Hr'g at 55–57 (emphasis added)). Thus, Defendant's suggestion that the Court "import[ed] the subsequently charged," (Motion at 5), identity theft counts into the affidavit is meritless. Indicia of fraud schemes of all varieties—including identity theft—was plain in the Affidavit.

*Finally*, Defendant's attempt to relitigate staleness arguments that the Court already considered and rejected should be rejected once again. (*See* Motion at 4 n.4, 4–6). These contentions are inappropriate in the context of a motion to reconsider. *See Pacific Ins. Co*, 148 F.3d at 403 ("The Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior."). In any event, they are meritless and should be rejected for all of the reasons outlined by the Government in its response—incorporated by reference here—and for all of the reasons already enunciated by the Court during the May 3, 2024 hearing. (Tr. Mots. Hr'g at 54–57).

Simply put, there was no error here—let alone a clear one—and Defendant comes nowhere close to meeting his high burden. The Motion thus fails.

What's more, Defendant's Motion should be denied because it is untimely. Indeed, it was filed outside of the fourteen-day deadline required by the Court, and no extension was requested. The Local Rules of this District require that a litigant file any motion for reconsideration within fourteen days after the entry of the order to which reconsideration is sought, unless a litigant files for an extension of the filing deadline. *See* Local Rules 105.10 (fourteen-day deadline for motions to reconsider), 105.9 (extensions of time), 207 (indicating that Local Rule 105 applies to criminal proceedings); *see also United States v. Cheese*, No. ELH-98-259, 2013 WL 3353321, at *2 (D.Md. July 1, 2013) (outlining applicable Local Rules in the context of a criminal motion for reconsideration).

Here, Defendant's Motion was filed on October 16, 2024, 166 days after the Court ruled on the Motion to Suppress, and Defendant did not file any extension request. (*See* ECF Nos. 61, 76). Defendant does not and cannot justify why he waited over five months to move for reconsideration. Accordingly, in addition to the reasons outlined above, Defendant's Motion should be denied as untimely.

## CONCLUSION

For all of the above reasons, Defendant's Motion for Reconsideration of Denial of Motion to Suppress (ECF No. 76) should be summarily denied without a hearing.

Respectfully submitted,

EREK L. BARRON
United States Attorney

By:   _____/s/_____

Paul A. Riley
Reema Sood
Assistant United States Attorneys
36 S. Charles Street, 4th Fl.
Baltimore, Maryland 21201