

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Paul Riley*<br>*Assistant United States Attorney*<br>*Paul.Riley @usdoj.gov* | *Suite 400*<br>*36 S. Charles Street*<br>*Baltimore, MD 21201-3119* | *DIRECT: 410-209-4959*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091* |

**<u>VIA ECF</u>**                                                                 April 1, 2025

The Honorable George L. Russell III
Chief United States District Judge
United States District Court
for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:     *United States v. Ryan Dales*, Criminal No. GLR-23-00026
        *United States v. Ryan Dales*, Criminal No. GLR-17-0060

Dear Chief Judge Russell:

The Government writes this letter in advance of the sentencing of Defendant Ryan E. Dales, which is currently scheduled for April 9, 2025 at 10:30 a.m.

On December 9, 2024, after a four-day jury trial, Defendant was convicted of Counts Two, Three, and Four of the Superseding Indictment.  Specifically, the jury convicted Defendant of Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (Count Two), Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1) (Count Three), and Possession of a Firearm in Furtherance of a Drug Trafficking Activity, in violation of 18 U.S.C. § 924(c) (Count Four).

Defendant was scheduled to begin trial on the remaining counts of the Superseding Indictment on January 13, 2025.  He was charged with four Counts of Wire Fraud, in violation of 18 U.S.C. § 1343 (Counts One, Five, Six, and Seven), and one Count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A (Count Eight).

One week before the second trial was to begin, on January 20, 2025, the Court accepted Defendant's guilty plea to Counts Five and Eight of the Superseding Indictment, charging him with Wire Fraud and Aggravated Identity Theft, respectively.

There is also a Violation of Supervised Release matter pending against Defendant.  *See United States v. Ryan Dales*, Criminal No. GLR-17-0060 (the "VOSR Case").  In light of the above-referenced convictions in the 2023 case against him, Defendant has also violated the conditions of his supervised release.

For all of the reasons that follow, the Government respectfully requests that that Court sentence Defendant to a total sentence of **316 months' (26.33 years')** imprisonment in the 2023 case and **24 months' imprisonment** in the VOSR case.

I.    **Background**

The facts admitted by Defendant in the parties' plea agreement (ECF No. 129) established that while serving a federal sentence for bank fraud conspiracy and aggravated identity theft and living in a halfway house and, thereafter, while on supervised release, in December 2020 and continuing through September 2022 in the District of Maryland, Defendant engaged in various schemes to defraud the State of Maryland, Maryland Department of Labor (MD-DOL), the Small Business Administration, and various businesses and financial institutions to obtain (1) more than $25,000 in unlawful COVID-19 benefits funds though the submission of fraudulent claims for unemployment insurance (UI) benefits; (2) over $95,000 worth of high-end riding lawn mowers on credit using stolen personal identifiable information (PII) of seven victims—information such as names, dates of birth, social security numbers, and addresses of real persons; and (3) attempting to fraudulently obtain an $8,000 Economic Injury Disaster Loan (EIDL).

Further, the facts proven at trial established that at the same time Defendant was engaged in this fraud and identity theft scheme, he was also running an illegal business buying and selling fentanyl out of his apartment while also possessing two firearms and ammunition, including a Polymer 80 ghost gun and a Smith and Wesson M&P 9c 9mm firearm.

All of the facts admitted by Defendant and established at trial are described in further detail below.

**Fraudulent Application For COVID-19 UI Benefits**

On December 15, 2020—shortly after he began residing at a Volunteers of America (VOA) Halfway House in connection with his past federal sentence—Defendant submitted a fraudulent UI claim program, falsely representing he was self-employed as a barber. That same day, MD-DOL advised Defendant that he was ineligible for benefits under the regular UI program.

On July 30, 2021, Defendant reopened his original UI claim seeking benefits from the Pandemic Unemployment Assistance, which was part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. Defendant submitted a false and fabricated 2019 Internal Revenue Service Form Schedule C in support of his application that falsely indicated that a purported sole proprietorship associated with Defendant (Knw G86oup) earned gross profits of $144,112.35, with total expenses adding up to $45,031—realizing Knw Gr86oup a net profit of $99,081.35.

In fact, the Defendant did not file an IRS Form Schedule C for tax years 2019 and 2020. Moreover, Defendant was federally incarcerated during the timeframe in which the purported IRS Form Schedule C provided to MD-DOL indicated that defendant's purported sole proprietorship realized a net profit of $99,081.35.

As a result of Defendant's fraudulent UI claim submissions, Defendant ultimately received $25,570 in funds from MD DOL.

**Fraudulent EIDL Application**

On December 29, 2020, while residing at the VOA Halfway House, Defendant submitted a fraudulent EIDL application for a purported agricultural business called "Ryan Dales" dba "Dales Drop Inc." The application sought a loan in the amount in the amount of $8,000. The application falsely claimed that it had three (3) employees, with 2019 gross revenues of approximately $10,000 and $6,000 in costs of goods sold. The application further falsely claimed that it was established on March 15, 2018—during the period of time when Dales was federally incarcerated. This purported agricultural business did not in fact exist. The SBA declined the loan, and it ultimately did not close.

2

**Identity Theft Scheme**

Beginning in or about June 2022, and continuing until in or about September 2022, Defendant also devised and executed a scheme to defraud various outdoor equipment retailers, The Toro Company ("Toro"), TD Bank Retail Card Services and TD Bank N.A. (together "TD Bank") by obtaining lines of credit through Toro and TD Bank using the personal identifiable information ("PII") of multiple real persons. The lines of credit allowed customers to make in-store purchases at various retailers, including outdoor equipment retailers that sold Toro lawnmowers.

Defendant repeatedly obtained lines of credits using the PII of individual identity theft victims.  Defendant opened obtained these lines of credit without the victims' knowledge or permission.

After obtaining these lines of credit, Defendant repeatedly used them to purchase—with no other form of payment besides the line of credit—high-end riding lawn mowers valued at approximately $10,000 to $19,000 each.  These purchases resulted in interstate wires, including wires to and from Maryland.

For example, on or about August 5, 2022, Defendant submitted a false and fraudulent application for a Toro Line of Credit to TD Bank, using the name and identity information of victim "MC" including the exact date of "MC's" birthdate in year 1982 and "MC's" social security number ending in 9004.  TD Bank approved the application and established a Toro Line of Credit account ending in 5413.  *See, e.g.*, Ex. 1A.

On or about September 13, 2022, Defendant purchased a Toro Z-Master 4000 HDX Pro XL lawnmower from Victim Business 1 by means of a $14,185.42 charge to the Toro Line of Credit fraudulently established in the name of "MC," resulting in interstate wires, including interstate wires to and from Maryland.  In connection with this purchase, Defendant presented Victim Business 1 a false, forged, and counterfeited South Carolina Driver's License bearing the name of "MC" and the photograph of Defendant, the year of birth of 1982, and the license number ending in 3390.  Defendant had earlier created this counterfeit Driver's License.

Defendant executed the scheme several more times during the same time period, using the PII of various victims to obtain the lawnmowers on credit, and using counterfeited South Carolina Driver's License bearing the name of the various victims and the photograph of Defendant, as set forth in the below table:

| DATE OF PURCHASE | DESCRIPTION |
|---|---|
| June 15, 2022 | $9,538.94 purchase in the District of Maryland from Victim Business 6 of Cub Cadet ZTX6 60 lawnmower, using Line of Credit in the name of "TS" |
| June 27, 2022 | $9,538.94 purchase in the District of Maryland from Victim Business 7 of Cub Cadet ZTX6 60 lawnmower, using Line of Credit in the name of "MP" |
| September 13, 2022 | $14,185.42 purchase in the District of Maryland from Victim Business 1 of Toro Z-Master 4000 HDX Pro XL lawnmower, using Line of Credit in the name of "MC" |
| September 16, 2022 | $13,786.94 purchase in the Eastern District of Virginia from Victim Business 4 of Toro Z 4000 lawnmower, using Line of Credit in the name of "JR" |

| September 20, 2022 | $15,322.29 purchase in the District of Maryland from Victim Business 2 of Lazer Z Series lawnmower, using Line of Credit in the name of "BL" |
|---|---|
| September 22, 2022 | $19,239.99 purchase in the District of Delaware from Victim Business 5 of Lazer X Series lawnmower, using Line of Credit in the name of "MP" |
| September 27, 2022 | $14,629.99 purchase in the District of Maryland from Victim Business 3 of Lazer Z Series lawnmower, using Line of Credit in the name of "JS" |

Defendant then sold each of fraudulently-obtained lawn mowers.  Neither he, nor anyone else paid the balances due in connection with the lines of credit Defendant had obtained in the victims' names.  Defendant used the funds he obtained in connection with his schemes to, among other things, rent and furnish a luxury apartment in Locust Point, which was located at 900 E. Fort Ave, Baltimore, MD 21230, with a monthly rent due of $3,064.

**Search Warrant At Defendant's Apartment And Fraud-Related Evidence**

On January 20, 2023, Defendant was arrested pursuant to a federal arrest warrant and, that same day, a federal search warrant was executed at Defendant's residence located at located at 900 E. Fort Ave. in Baltimore.

During the execution of the search warrant, law enforcement located and seized various items used in connection with Defendant's fraud and identity theft schemes, including:

- multiple computers;
- an embosser and ID card printer;
- laminate sheets with security holograms;
- gift cards in various denominations;
- a card printer and card reader;
- bulk packages of shrink-wrapped white PVC cards; and
- multiple fraudulent and fabricated South Carolina driver's licenses made by Defendant containing PII of various victims—including victims RL, JE, JS, JR, MC, BL—but Defendant's photograph.[1]

Defendant used these fraudulent and fabricated driver's licenses in connection with the fraudulent purchases of riding mowers discussed above as well as other impermissible uses. Defendant obtained the identity theft victims' PII on the dark web.

After voluntarily waiving his *Miranda* rights, Defendant agreed to speak with investigators. He admitted to, among other things, to obtaining  fraudulent UI benefits.  He further admitted to possessing fabricated South Carolina driver's licenses, but falsely claimed that he used them in connection with attempting to rent an apartment in Baltimore.

Law enforcement's review of the devices seized from Defendant's residence revealed, among other things, numerous records pertaining to the fraud and identity theft schemes discussed

---

[1] Photographs of certain of these ID cards are attached as Exhibit 2A.

4

above, including records containing victim PII, correspondence concerning the purchase and sale of the fraudulently-obtained mowers, and photographs of various mowers.

The total amount obtained by the Defendant from the UI fraud scheme, as well as the fraudulent purchase of the lawnmowers on credit was $121,242.51.

## Search Warrant At Defendant's Apartment And Drug And Firearm Related Evidence[2]

During the execution of the search warrant, law enforcement also located and seized, among other things: (1) a loaded black Polymer80 9mm firearm with no serial number; (2) a loaded black Smith and Wesson M&P 9c 9mm firearm, SN: HDW0599; (3) a black handgun magazine containing 12 rounds of "Blazer" ball ammunition; (4) 28 rounds of assorted 9mm ammunition in a "Blazer" ammunition box; (5) a large plastic bag labeled "PURECAPS USA" containing 716 gel caps filled with white and brown powder; (6) a heat sealed baggie containing a brown powder substance; (7) a plastic baggie containing a brown powder substance; (8) a plastic baggie containing a white powder substance; (9) a large clear bag labeled "10,000 Count" containing hundreds of empty gel caps; (10) a "Nutribullet" blender with white powder residue; (11) a brown leather firearm holster; (12) digital scales covered in powder residue; (13) six cell phones; (14) multiple sifters, baggies, and other plastic packaging materials; and (15) several identifying documents, including Dales' birth certificate, Maryland ID card, and Navy Federal bank card, as well as multiple receipts.[3]

Hongde Pan, a Forensic Scientist at Baltimore City Police Department's Drug Analysis Unit, testified about his review of the drug evidence seized from Defendant's apartment. Pan tested the suspected drug evidence, including samples from the hundreds of gel caps and the baggies containing white and brown substances seized from Defendant's residence. Pan found that the gel caps contained a mix of fentanyl and 4-Anilino-N-Phenethylpiperidine (4-ANPP).

Pan also found that one of the heat-sealed baggies of brown powder substance contained a net weight of over 45 grams of fentanyl. In total, the net amount of a substance containing a detectable amount of fentanyl was over 339 grams.

Detective Sergeant Keith Sokolowski of DPSCS testified as an expert in drug trafficking. Sokolowski explained that fentanyl is not produced in Maryland but is instead manufactured in source countries such as Mexico and China. Fentanyl is then transported through freight, couriers, the mail, and other avenues into the United States, where it is cut with other agents to produce larger quantities for distribution. Drug traffickers commonly use scales, sifters, respirators, plastic baggies, gel caps, and blenders in the cutting process. The gel caps found in Dales home would sell for approximately $10 each in Baltimore. Drug traffickers also use encrypted platforms such as Telegram and WhatsApp to communicate with wholesale drug producers. Firearms are used to protect a drug trafficker's person, stash, and money, and are often kept in close proximity to the drugs and places of vulnerability.

Jessica Van Dyke, a forensic examiner at FBI in Quantico, Virginia, testified as an expert in forensic serology and DNA analysis. Van Dyke testified about what DNA is and how DNA can be transferred from a person onto an object. She explained the various testing methods she uses to recover DNA from items. Van Dyke reviewed several pieces of evidence recovered from Dales' residence and compared them to Dales' DNA profile, which SA Baugh testified was obtained by a search warrant. Van Dyke found very strong support for the inclusion of Dales' DNA on the

---

[2] All of the facts set forth in the following subsections of the Background section where established at trial.

[3] Photographs of some of recovered items are attached as Exhibit 3A, and overview of the location of the seized items is attached as Exhibit 4B.

grip of the Polymer80 firearm, the textured areas of the Polymer80 firearm, the grip of the Smith and Wesson M&P 9c, the textured areas of the Smith and Wesson M&P 9c, and the magazine of the Smith and Wesson M&P 9c.  Van Dyke testified about the process by which analysts create "likelihood ratios" as to the probability DNA results are linked to the person of interest as opposed to an unknown, unrelated contributor.  She concluded that Dales was very likely to have contributed the DNA found on the firearms

### Interview of Defendant, Jail Calls And Electronic Evidence

FBI Special Agent Summer Baugh testified about the January 20, 2023 *Mirandized* interview of Dales, and portions of the interview were entered into evidence.  During the interview, Dales confirmed, among other things, that (1) he has lived alone at the 900 E. Fort Avenue address for about a year; (2) he uses many email addresses, including ryandales88@gmail.com and theycallmedales@gmail.com; (3) he used various phones to communicate with different people (4) he had the firearms that were found in his residence for "a while" and had purchased them "hand-to-hand" with cash; and (5) the gel caps that were found in his residence were "probably fentanyl."  SA Baugh also testified about jail calls that she reviewed after Dales was incarcerated, and a call from January 21, 2023 at 5:16 PM was entered into evidence.  Dales made multiple inculpatory statements during the call, including, "I hope that 924(c) don't come."

SA Baugh testified about her review of extractions of devices seized during the search warrant of Defendant's apartment.  It revealed that Defendant was linked to several online accounts, including accounts on Telegram, WhatsApp, Skype, and Signal.  Dales' cell phones and online accounts included multiple inculpatory photographs of Dales, firearms, cash, and what appeared to be drugs.  One particular photo depicted a bag similar to a bag seen in Dales' apartment filled with cash and what appeared to be a firearm.  Dales' cell phones also included inculpatory searches, such as, "how to dye powder," "pillcapping machine," "can you shoot a gun multiple times while cocking it once," "whats the best way to mix powders," "is ketamine more dangerous than fentanyl," and "how many bullets does a m&p 9c hold."  *See* Ex. 5A.

Dales' Telegram, WhatsApp, and Skype accounts included inculpatory messages about purchasing fentanyl, carfentanil, ketamine, and other substances from sellers in China.  Dales's Telegram messages also included detailed discussions about his purchase of fentanyl in Boston, Massachusetts in December 2022, about a month before the execution of the residential search warrant at his apartment.  *See* Ex. 6A.

### II.    Guidelines Computation

The PSR accurately calculates the applicable sentencing guidelines range in this case.  *See* PSR at 13-16.  However, because the parties' plea agreement, ECF No. 129, noted that Defendant would receive a two-level reduction for acceptance of responsibility, *id.* at 5, the Government—out of an abundance of caution—asks that the Court apply a two-level reduction here.  Thus, the guidelines calculation is as follows:

### A. Count Two – Felon in Possession of a Firearm and Ammunition[4]

| | |
|---|---|
| Applicable Statute: | 18 U.S.C. § 922(g)(1) |
| Minimum Penalty: | N/A |
| Maximum Penalty: | 20 years |

---

[4] The PSR correctly notes that Counts Two and Three Group.  PSR at 13.

Applicable Sentencing Guidelines:      2K2.1

| | | |
|---|---|---|
| Base Offense Level: | § 2K2.1(a)(2)[5] | 24 |
| ADJUSTED OFFENSE LEVEL | | 24 |

## B.  Count Three – Possession with Intent to Distribute Controlled Substances

Applicable Statute:      21 U.S.C. § 841(a)(1)
Minimum Penalty:      5 years
Maximum Penalty:      40 years
Applicable Sentencing Guidelines:      2D1.1

| | | |
|---|---|---|
| Base Offense Level: | § 2D1.1(6) | 28 |
| ADJUSTED OFFENSE LEVEL | | 28 |

## C.  Count Four – Possession of a Firearm in Furtherance of a Drug Trafficking Crime

Applicable Statute:      18 U.S.C. § 924(c)
Minimum Penalty:      5 years mandatory consecutive
Maximum Penalty:      Life
Applicable Sentencing Guidelines:      2K2.4

Under § 2K2.4, the guideline sentence is the minimum term of imprisonment required by statute—five years' imprisonment consecutive to any other sentence—subject to Defendant's status as a Career Offender (discussed further below).

## D.  Count Five – Wire Fraud

Applicable Statute:      18 U.S.C. § 1343
Minimum Penalty:      N/A
Maximum Penalty:      20 years
Applicable Sentencing Guidelines:      § 2B1.1

| | | |
|---|---|---|
| Base Offense Level: | § 2B1.1(a)(1) | 7 |
| Loss over $95,000 but less than $150,000: | § 2B1.1(b)(1)(E) | 8 |
| Sophisticated Means | § 2B1.1(b)(10)(C) | 2 |
| Possession of Device-Making Equipment; Possession of 5 or More Means of Identification | § 2B1.1(b)(11)(A), (C) | 2 |
| ADJUSTED OFFENSE LEVEL | | 19 |

---

[5] Defendant has in the past sustained two controlled substance offenses.

### E.  Count Eight – Aggravated Identity Theft

| | |
|---|---|
| Applicable Statute: | 18 U.S.C. § 1028A |
| Minimum Penalty: | 2 years mandatory consecutive |
| Maximum Penalty: | 2 years |
| Applicable Sentencing Guidelines: | § 2B1.6 |

Under § 2B1.6, the guideline sentence is the minimum term of imprisonment required by statute—two years' imprisonment consecutive to any other sentence.

### F.  Grouping

Pursuant to U.S.S.G. § 3D1.4 and because the group pertaining to the wire fraud offense is 9 or or more levels less serious than the group with the highest offense level, the total number of units is **one (1)** and therefore there is no increase to the highest offense level (**28**) (**Subtotal:  28**).

### G.  Career Offender Status And Guideline Range

The Defendant is a Career Offender under § 4B1.1(a) in light of his drug conviction in the instant case and his two past drug convictions for Distribution of Heroin and Possession with Intent to Distribute Heroin.  PSR at 15.

In light of Defendant's Career Offender status, he is a **Criminal History Category VI.**[6] Accordingly, taking into account a two-level deduction for Defendant's acceptance of responsibility in connection with his guilty plea in the fraud matter, the applicable sentencing guidelines range is **292-365** months (§ 4B1.1(c)(3)) to be followed by 2 years' imprisonment consecutive to account for Defendant's conviction as to Count Eight or a total sentencing range of **316-389 months' imprisonment**.

Regarding the VOSR case, the most serious grade of violation, Grade A, is applicable here, and Defendant, again, is a Criminal History Category VI.  Accordingly, pursuant to U.S.S.G. § 7B1.4, the term of imprisonment applicable under the guidelines upon revocation of supervised release is **33-41 months' imprisonment**.

### III.     Sentencing Factors Under 18 U.S.C. § 3553(a)

The nature and circumstances of the Defendant's offense warrant the Government's recommended sentence of 316 months' imprisonment in GLR-23-00026 and 33 months' imprisonment in the VOSR case.

There is no question that Defendant's offense is serious.  While living in a Bureau of Prisons half-way house after being sentenced by this Court to over five years' imprisonment and thereafter while on supervised release, Defendant engaged in a host of new crimes:  Fraud crimes, identity theft crimes, and drug/gun crimes.  Regarding Defendant's drug crimes, Defendant engaged in an illegal business acquiring (including from overseas), cutting, and packaging fentanyl for sale on the streets of Baltimore.  Baltimore of course has been ravaged by the opioid—and particularly fentanyl—crisis.  *See, e.g., Almost 6,000 Dead in 6 Years: How Baltimore Became the*

---

[6] Even if Defendant were not a Career Offender, he would still be a Criminal History Category VI, having amassed 15 criminal history category points.  PSR at 23.

*U.S. Overdose Capital*, Alissa Zhu, N.Y. Times, May 23, 2024 (noting that "Fatal drug overdoses have occurred on a third of the city's blocks" and that "[t]he city was once hailed for its response to addiction. But as fentanyl flooded the streets and officials shifted priorities, deaths hit unprecedented heights").  Defendant directly contributed to this epidemic and, in Telegram messages, flippantly discusses the deadly potency of the fentanyl seeks to put on the streets of Baltimore, as detailed in the below messages.  Defendant repeatedly references the strength of the fentanyl and exclaims—in response to his Boston supplier telling Defendant to wear gloves when handling the fentanyl—"**Baltimore is different I swear to you.**"





Further, the Defendant's drug offense is likewise aggravated by the fact that he not only maintained an illegal business selling deadly fentanyl but—despite being prohibited from doing so—possessed ammunition and two firearms in connection with that business, including an

untraceable Polymer 80 ghost gun, a particularly dangerous variety of firearm. *See, e.g.*, *1 in 5 guns on Baltimore's streets don't have serial numbers. That's a problem.*, Lee O. Sanderlin, The Baltimore Banner, Feb. 23, 2024.

But Defendant did more than operate a drug shop where he received, cut, and packaged drugs for distribution. Even before he got into the drug business—including while he was still in BOP custody—he engaged in a variety of fraud and identity theft schemes, a further aggravating factor that warrants the very significant sentence being sought by the Government here. Defendant obtained more than $25,000 in unlawful COVID-19 benefits funds though the submission of fraudulent claims for UI benefits. He obtained over $95,000 worth of high-end riding lawn mowers on credit using stolen personal identifiable information (PII) of seven victims. He attempted to obtain an $8,000 EIDL. And he maintained in his apartment all of the tools to make his fraudulent ID cards (such as the ones with the victim identities but his face found in his apartment) and access devices. What's clear is that Defendant not only had the ability to make bogus ID cards with victim PII, but also the ability to make reencoded credit/debit cards using victim PII.

At bottom, the scope of Defendant's fraud conduct was extensive—with respect to the length of time Defendant perpetrated his scheme, the amount of loss (over $120,000), and the fact that his scheme impacted innocent victims whose identities he used. Defendant's fraud activities spanned almost two years and encompassed a variety of schemes—fraud and identity theft involving high-end lawnmowers, Maryland UI benefits, as well as fraud involving a Government-backed EIDL. Simply put, Defendant engaged in numerous individual acts of theft and deceit in connection with his offense—even setting aside his significant drug and firearm activities.

Defendant's offense was not the result of a momentary lapse of judgment by an otherwise law-abiding citizen. It was not a split-second decision made under financial duress. To the contrary, it was the result of years of deceitful and self-serving criminal conduct of all types. As Defendant put it during his interview with law enforcement after his arrest, he is a "very resourceful person." Indeed, he used every tool at his disposal to commit crimes of many types, and he did so without a care or thought of anyone but himself.

The Government's recommended sentence would adequately deter not only those who may consider engaging in similar conduct, but also Defendant himself, as well as protect the public from further crimes of Defendant. As noted, Defendant *was in BOP custody* at the time he began his crime spree in this case. The Court sentenced Defendant to 62 months' imprisonment in connection his past federal convictions for or Bank Fraud Conspiracy and Aggravated Identity Theft. PSR at 21. That sentence did nothing to deter Defendant from immediately engaging in criminal conduct upon his release from custody.

Defendant likewise has multiple other past convictions involving theft or fraud. He has a 2008 Theft conviction out of Baltimore County. PSR at 16. He was ordered to pay over $18,000 in restitution to AT&T as a result. *Id.* Defendant likewise has 2010 conviction out of Baltimore County for Obtain Property By Counterfeit. PSR at 17. That offense involved Defendant's use of stolen identifies—for which he possessed fake identification cards—and the attempted use of fraudulent credit cards to purchase electronics. *Id.* Defendant has likewise sustained multiple past drug convictions. He has 2013 conviction out of Anne Arundel County for Possession with Intent to Distribute Heroin. PSR at 19. He has a 2013 conviction out of Baltimore City for Distribution of Heroin. *Id.* Defendant has also been convicted for repeatedly taking the road in automobiles while under the influence of alcohol.

Simply put, Defendant's steady stream of criminal conduct is concerning. His past offenses and the ones at issue here paint the picture of a person who poses a significant danger to the

community and has trouble living a law-abiding life for very long at all.  Indeed, as noted above, Defendant was under federal supervision at the time of the offense conduct in this case.

Regarding Defendant's history and characteristics, Defendant did graduate high school and attended at least some college.  PSR at 31.  He reported a history of mental health issues and some challenging circumstances during his upbringing.  *Id.* at 29-30.  He further reported some history of drug and alcohol abuse.  *Id.* at 30-31.  The Government does not contest that Defendant perhaps, at times, faced difficult circumstances in his youth.  But that is not a sufficient reason for the Court to impose a variant sentence.  The sad reality is that many Americans confront similar hardships— mental health issues, substance abuse, and challenging family situations.  What makes Defendant stand out is not that he faced such difficulties, but that unlike the overwhelming majority of people in comparable circumstances, he turned to the type of criminal activity that tears families and communities apart—putting dangerous fentanyl on the streets of Baltimore and possessing firearms in further of his drug sales business—and committing a host of other crimes too.  There simply are no extenuating or mitigating factors in this case that warrant a downward variance from the Guidelines.

## IV.    The Government's Sentencing Recommendation

In light of all of the factors set forth above, the Government recommends that the Court sentence Defendant to a total sentence of 316 months' imprisonment in GLR-23-00026 to be followed by five years of supervised release.  Such a sentence would be sufficient but not greater than necessary to accomplish the purposes of sentencing under the Section 3553(a) factors.

The Government also asks that the Court sentence Defendant to 33 months' imprisonment in the VOSR case.

Finally, the Government also respectfully requests that the Court order restitution in the total amount of $121,242.51, broken down as follows:

- TD Bank Retail Card Services – $95,672.21
- Maryland Department of Labor – $25,570.[7]

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:    _____/s/_____
Paul Riley
Reema Sood
Assistant United States Attorneys

cc:    Richard Bardos, Esq. (by ECF)
Paige Cameron, U.S. Probation Officer (by electronic mail)

---

[7] The Government will provide the addresses where restitution should be sent in advance of sentencing.